IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| BRIAN KEITH FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:12cv1094-MHT |
| | ) | (WO) |
| CITY OF GOODWATER and | ) | |
| JONATHAN PITTS, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

Defendant Jonathan Pitts, a police officer for defendant City of Goodwater, Alabama, shot plaintiff Brian Keith Ford, causing him serious physical and psychological harm.  Relying on 42 U.S.C. § 1983, Ford sued Officer Pitts and the city asserting that Pitts violated his Fourth Amendment right against the use of excessive force and that the city failed to screen Pitts sufficiently before hiring him; he also asserts several state-law tort claims against both defendants.  Jurisdiction is properly invoked pursuant to 28 U.S.C. § 1331 (federal question) and § 1367 (supplemental).

This case is now before the court on the motions for summary judgment filed by Officer Pitts and by the City of Goodwater.  For the reasons discussed below, the motions will be partially granted and partially denied.

## I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II. BACKGROUND

Ford went to the Goodwater Municipal Court to contest a misdemeanor charge of harassment, but before the afternoon was over, Officer Pitts had shot him.  The witnesses to the intervening events offer differing

accounts of what happened in the courtroom. At this stage in the proceedings, the court may not weigh the credibility of the various stories. Instead, the court must view the facts in the light most favorable to Ford, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), but with one exception: the court may adopt testimony contrary to Ford's where that part of Ford's testimony is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

### A.

On the day in question, Ford's mobility was limited. Approximately one month earlier, he had broken his hip in a car accident. His doctor told him not to walk, and he was supposed to use a walker for three months. However, because the Goodwater City courthouse has a number of stairs at the entrance, he used a pair of crutches to get to get into court and assist him with walking.

3

Ford came to court with his then-fiancée to stand trial for a misdemeanor charge of verbal harassment. When his case was called, Ford and the complainant came forward. According to Ford, the exchange between him and the trial judge was as follows: The judge launched directly into the substance of the case; he did not give Ford the opportunity to request a court-appointed attorney, despite the fact that such an attorney was standing in the courtroom; the judge first asked the complainant to describe the harassment that she alleged; he then asked Ford for his side of the story, and Ford entirely denied that the incident had occurred; however, soon after Ford began talking, the judge cut him off.

The judge found Ford to be guilty and sentenced him to a fine of $ 808 (including costs) or 30 days imprisonment if he could not immediately pay the fine. At this point, according to Ford, Ford asked for an attorney and asked for permission to go to the gallery to get cash from his fiancée so that he could pay the fine, but the judge

4

became impatient and refused to allow Ford to get the cash.  Since Ford was not immediately able to pay the fine, the judge instructed him to sit along the wall of the courtroom with other defendants who were to be imprisoned.  Ford began to walk toward the chairs.

At this point, Ford became emotional.  He was anxious that he would not receive adequate medical treatment for his broken hip while he was in jail and upset that he would be separated from his young daughter.  He slammed one of his crutches on the ground and turned back to the center of the courtroom.  He began to plead with the judge that he was innocent and deserved a fair trial and a lawyer:

> "I said, man, I said, you're locking me up for something I didn't do.  You won't even give me a chance to get a lawyer. I say, you're violating my constitutional rights. I said, I know the law; you know, this is not my first rodeo.  I know that I can have an attorney present and you just can't sentence me and give me 30 days in jail."

Ford Dep. (Doc. No. 17-1) at 106:3-11.  In his excitement, Ford gestured with one of his crutches and dropped the other crutch.  He then tucked the crutch he continued to hold under his arm and began to limp toward the judge.

Pitts was the security officer in the court that day. At this point, Officer Pitts approached Ford and put his hand on Ford's shoulder. Pitts said, "come on, Ford, you're going to jail; let's just get this over with." Ford Dep. (Doc. No. 17-1) at 110:12-13.  Ford shrugged his shoulder away from Ford's hand, saying, "no, I'm not going to jail for something I didn't do." Id. at 110:19-20.  At this point, Pitts backed away from Ford and pulled out his gun.  Although Pitts was carrying a taser, he chose not to use it.[1]

--------

1. In a filing styled as a motion to strike (doc. no. 29), Officer Pitts suggests that the court should ignore witness testimony that he had a taser because recognition that an object was a taser would be an expert opinion and the witnesses were not "qualified to determine the identity of a taser." Mot. to Strike (doc. no. 29) at 3. Even accepting Pitts's characterization that identifying a taser would be opinion evidence, it is not an opinion based on "scientific, technical, or other specialized

(continued...)

Ford continued to approach the bench, making statements like, "I'm tired of this shit." <u>Id</u>. at 116:2. At this point, the trial judge "was getting loud and confrontational with ... Ford." Simpson Aff. (Doc. No. 26-4) at 2.

Suddenly, the trial judge pulled a gun out from behind the bench and pointed it at Ford, but Ford continued to approach the bench.  When he reached the bench, he dropped his second crutch and grabbed onto the bench to hold himself up.  Ford said, "Oh, you gone shoot me now?" Simpson Aff. (Doc. No. 26-4) at 1; Ford Dep. (Doc. No. 17-1) at 121:1-3.  Ford continued to ask the judge to reconsider his verdict, arguing that he had not received a fair hearing and was entitled to a lawyer.  As Ford talked, the judge moved the gun so that it was no

---

(...continued)
knowledge." Fed. R. Evid. 701(c).  Tasers are sufficiently common that a lay witness's identification of the weapon might be admissible if the witness is, in fact, familiar with tasers.

longer pointing at Ford.  But, throughout Ford's time at the bench, he was within close proximity to the gun.

At this point, Officer Pitts was behind Ford with a gun pointed at him.  Pitts ordered Ford to get on the ground, but Ford was not able to move to the ground because of his broken hip.  Ford looked back at Pitts and saw that Pitts was moving side to side with a gun pointed at him.

After Ford did not get on the ground, Officer Pitts fired two shots at Ford.  One shot went through his left side and came out the right side of his stomach.  The other shot went in his back and also went out the right side of his stomach.  One of these shots also went through

his hand.[2]  After the second shot, Ford collapsed to the ground.

Ford experienced significant physical and psychological injury from the shooting.  He lost one of his kidneys and part of his liver, and his other kidney is having difficulty functioning.  The nerves in his left hand are damaged, so that he no longer has feeling in two of his fingers and cannot extend those fingers.  He has digestive issues.  He was diagnosed with Post-Traumatic Stress Disorder, and he has developed delusions and aural

---

2.  In his testimony, Ford says that he was shot a third time, while he was on the ground and that this was the shot that went through his hand.  However, a forensic examination of the site by the Alabama Bureau of Investigation uncovered only two bullets and casings. Furthermore, all of the other witnesses, including Ford's affidavit witnesses, testify that Pitts fired two shots. Taken together, this evidence "utterly discredit[s]" Ford's testimony that he was shot a third time.  See Morton v. Kirkwood, 707 F.3d 1276, 1285 (11th Cir. 2013) (finding that plaintiff's testimony can be ignored at summary judgment when the forensic evidence "utterly discredit[s]" the plaintiff's account of events).  This is not to say that the court necessarily believes that Ford is lying about the third shot, but rather that he may incorrectly remember the traumatic events of that day.

hallucinations of gun shots. When he is around loud sounds or bald white men, who resemble Pitts, he becomes very afraid.

### B.

The City of Goodwater hired Officer Pitts in late 2010. The mayor and city council are responsible for hiring police officers.  At the time Pitts was hired, the city clerk collected applications and performed a criminal background check on each applicant.  The clerk then passed the application and background check results to the mayor and council.  The city performed no other reference checks as part of the hiring process, and the police chief was not consulted during the process.[3]   After an interview

_____

3. The police chief testified:

"Q: So did you see the application at all before the mayor made that decision [to hire Pitts]?

"A: The--not at the council meeting.  I was able to look at his driver's license and the front page of the application

(continued...)

with the mayor and a committee of the council, the council voted to authorize the mayor to hire Pitts, and he did.

Several of Pitts's previous employers had criticized and disciplined him for excessive force and overreactions to criminal defendants and inmates.   When he was a correctional officer for Tallapoosa County, Alabama, he was reprimanded for "angry outbursts with inmates." Tallapoosa Cnty. Records (Doc. No. 40-4) at 1.   As a police officer for the Town of Camp Hill, Alabama, he was sued for excessive force while handcuffing a defendant.

Finally, Pitts was fired from his position as a police officer with Bay Minette, Alabama, due to his use of force.   A criminal defendant becam agitated in the backseat of his police cruiser, where she was secure and did not present a danger to an officer or others.   Pitts "took it upon himself to open the back door of the patrol car and drag the prisoner out by the neck while

_____

(...continued)

the night of--that he was hired."

Whetstone Dep. (Doc. No. 40-2) at 15:17-22.

11

handcuffed; threw her on the pavement causing scratches and bruises to the prisoner knees and elbows." Bay Minette Personnel File (Doc. No. 40-5) at 1.

Pitts had previously been ordered to take anger management classes after other incidents.

The City of Goodwater knew nothing about Officer Pitts's previous employment when it hired him.


**C.**

Officer Pitts also had a history of involvement with Ford, both before and during his employment by the City of Goodwater. Pitts and Ford first met while Ford was incarcerated at the Tallapoosa County Jail. They got into several arguments and verbal disagreements while Ford was incarcerated, and Ford believes that Pitts singled him out for punishment. Later, when Pitts was an officer for the Town of Camp Hill and City of Goodwater, he pulled Ford over frequently and arrested him for several charges which were later dismissed. As a Goodwater police officer, he

would ride by Ford's house slowly in a threatening manner
and follow Ford while he was driving.

### III. DISCUSSION

#### A. Claims Against Pitts

#### 1. § 1983: Excessive Force

Ford claims that, when Officer Pitts shot him, he
violated his Fourth Amendment right, as enforced by 42
U.S.C. § 1983, against the use of excessive force.[4]  Pitts
raises the defense of qualified immunity.

"[G]overnment officials performing discretionary
functions generally are shielded from liability for civil
damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a

_____

4. In his complaint, Ford also pled that Pitts had
violated his Fourteenth Amendment right to due process.
However, he seems to have abandoned this claim. That
abandonment was wise, because Ford's case sounds solely
in the Fourth Amendment. See Carr v. Tatangelo, 338 F.3d
1259, 1267 & n.15 (11th Cir. 2003) (plaintiff who was
shot by police officer could maintain only a Fourth
Amendment claim, while plaintiff who was not physically
injured during the shooting could maintain only a
Fourteenth Amendment substantive-due-process claim).

reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Since there is no dispute in this case that Officer Pitts was acting within the scope of his discretionary function when he shot Ford, the court must address two questions:  Did Pitts violate Ford's constitutional right against excessive force? And, if so, was it clearly established at the time of the shooting that the constitution prohibited such an act?[5]   In answering these questions, Ford bears the burden of showing qualified immunity is inappropriate.  <u>Terrell v. Smith</u>, 668 F.3d 1244, 1250 (11th Cir. 2012).

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7

---

5. In <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009), the Supreme Court held that a court does not necessarily need to address the question of whether a constitutional violation occurred if it holds that the right was not clearly established. <u>Id</u>. at 236.  Nonetheless, the court retains the discretion to do so.  It is particularly appropriate to address the presence of a constitutional violation in this case, because there is also a question of whether the City of Goodwater should be held liable for any constitutional violation.

(1985).  The court must "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009).  The court must resist the temptation to indulge in "the 20/20 vision of hindsight" and instead "allow[] for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989).  The court also may not inquire into the actual motivations for the use of force; the only appropriate question is whether a reasonable officer could have made the same decision. Whren v. United States, 517 U.S. 806, 813 (1996)(holding that racial bias cannot be considered during Fourth Amendment review of a traffic stop).  Therefore, although Ford presents evidence

that Officer Pitts had improper motives for shooting him, the court cannot take those motives into account on the constitutional claim.

A police officer may constitutionally use deadly force when the officer "(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others ... (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003)). While these factors can be helpful, the court "must still slosh [its] way through the factbound morass of 'reasonableness.'" Morton, 707 F.3d at 1281 (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)).

Even accepting Ford's side of the story, the court cannot find that Officer Pitts's use of deadly force, by pulling the trigger, was unreasonable.  Ford was visibly

16

agitated, and, even if he did not actually have his hand on the trial judge's gun (as Pitts maintains he did), he was within easy reaching distance of a firearm.   He therefore presented a serious danger to the officer and all of the other people in the courtroom.   A reasonable officer could therefore believe that deadly force was necessary to protect the judge and others within the courtroom.   "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007).[6]

---

6.   To be sure, at oral argument Ford contended that the judge, not he, was responsible for the gun's presence on the bench.   Regardless as to whether it is prudent for a judge, who may not be specifically trained in the use of deadly force to protect the public and public officials, to have a gun in a courtroom (for, as it can be reasonably argued from the evidence here, there is a strong possibility that the gun could be used against the judge), the critical fact remains that Officer Pitts was not responsible the gun's presence on the bench, and thus the court remains convinced that a police officer, confronted with these circumstances, could reasonably believe that deadly force was necessary to protect the judge and others within the courtroom.

17

Furthermore, Pitts verbally commanded Ford to get down before he pulled the trigger.

Since the court does not find that Officer Pitts violated Ford's constitutional rights, there is no need to address the clearly established prong of qualified immunity. Pitts is entitled to qualified immunity on Ford's § 1983 claim.

### 2. State-Law Claims

In addition to his § 1983 claim against Officer Pitts, Ford also brings claims of negligence, wantonness, assault and battery, and false-arrest against him. Pitts responds that these claims are barred by state-agent immunity under the 1975 Ala. Code § 6-5-338 and Ex Parte Cranman, 792 So. 2d 392, 405 (Ala. 2000). The Alabama Supreme Court has held that the immunity provided to peace officers under the statutory and common-law schemes are coextensive. Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala. 2004).

18

State-agent immunity shields a law-enforcement officer from suit "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." 1975 Ala. Code § 6-5-338. However, "a State agent shall not be immune from civil liability in his or her personal capacity ... when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Hollis, 950 So. 2d at 307. Thus, where federal qualified immunity is merely an objective test, Alabama state-agent immunity looks through to the officer's actual motives in taking an action.

State-agent immunity would protect Pitts from liability for negligence and wantonness claims. Negligent actions could not, by definition, have been willful or malicious. Similarly, Pitts's wantonness claim is barred by state-agent immunity: "poor judgment or wanton misconduct, an aggravated form of negligence, does not

rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in Cranman." Ex parte Randall, 971 So. 2d 652, 664 (Ala. 2007).

Ford's false-arrest claim must fail as well. He claimed that Officer Pitts "rendered him unable to leave" by shooting him, constituting false arrest or imprisonment. Resp. to Pitts's Mot. For Summ. J. (Doc. No. 26) at 15. At the time that Ford was shot, he was lawfully in state custody following the judge's verdict and sentence for his harassment charge. "When considering whether an arrest is valid [for a false-arrest claim], a police officer's subjective intent is immaterial." Carruth v. Barker, 454 So. 2d 539, 540 (Ala. 1984). Probable cause provides sufficient justification under Alabama law to defeat false-arrest claims. Walker v. City of Huntsville, 62 So. 3d 474, 493 (Ala. 2010). When the officer already has lawful custody of the plaintiff, there can be no ground to claim that the plaintiff was

additionally falsely arrested or imprisoned.  Furthermore,
Ford's purported false-arrest claim would overlap entirely
with his assault and battery claim.  For these reasons,
summary judgment will be granted as to the false-arrest
claim.

However, the court will not grant summary judgment on
the assault and battery claim.  Ford does raise a genuine
question of material fact as to whether Officer Pitts's
actual motive in shooting him was willful, malicious, or
in bad faith.  See Cranman, 792 So. 2d at 405.  Ford puts
forward several ways in which Pitts may have been
improperly motivated to shoot him.  Ford discusses a
years-long animosity between himself and Pitts that dates
back to Ford's incarceration in the Tallapoosa County
Jail.  Alternatively, Pitts could have been expressing an
inappropriate and bad-faith desire to punish (with deadly
force) behavior that he perceived to be insolent.

If, as Ford argues, Officer Pitts had a taser as well
as a gun, that also raises questions about Pitts's motive.

21

When Ford started to walk around the courtroom gesturing with his crutch, Pitts approached him to try to calm him down and escort him back to his seat.  Pitts put his hand on Ford's arm or shoulder, and Ford evaded Pitts's grip. At this point, before anyone knew that the judge had a gun, Pitts backed away from Ford and prepared to shoot him.  This chronology is supported by the trial judge's deposition testimony: "After Pitts had done pulled his pistol, I grabbed mine." Teel Dep. (Doc. No. 17-2) at 12:14-15.  Under this scenario, it could be reasonably argued that Pitts was ready to shoot Ford before the judge took out his gun, even though he had the option of using his taser, a non-deadly weapon. <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011).  Nonetheless, he chose to use deadly force on Ford.  If Pitts's actions were improperly motivated, Ford would have a claim for assault and battery.

For these reasons, Ford's assault and battery claim will go forward.  However, summary judgment will be

22

granted against him on his negligence, wantonness, and false-arrest claims against Pitts.

### B. Claims Against the City of Goodwater

#### 1. § 1983: Municipal Liability

Ford seeks to hold the City of Goodwater liable for its failure to investigate Officer Pitts's background before hiring him, as well as for its failures to train and supervise him.

In order to prevail on the failure-to-screen claim, Ford "must demonstrate that the municipal hiring decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1313 (11th Cir. 2001) (citing <u>Board of County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 411 (1997)).[7]  Similarly, for the

---

7. In the briefs, both parties seem to discuss this claim as though evidence of a policy or custom beyond the hiring of Pitts is necessary to establish municipal

(continued...)

failure-to-train-and-supervise claims, Ford "must show that his constitutional rights were violated." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). Since Pitts did not violate Ford's federal constitutional or statutory rights, the city cannot be held liable under § 1983 for failure to screen, train, or supervise him.


## 2. State-Law Claims

Finally, Ford presents state-law claims against the city: a respondeat-superior claim for Officer Pitts's

---

(...continued)

liability. While this is often true, "a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body ... [or] other officials 'whose acts or edicts may fairly be said to represent official policy.'" Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (quoting Monell v. Dept. of Social Services, 436 U.S. 658, 694 (1978)). This rule encompasses hiring decisions made by an officer with "final authority to act for the municipality in hiring matters." Brown, 520 U.S. at 408. The mayor and city council jointly hired Pitts, and the city has presented no evidence that these officials did not have final authority to hire. As a result, the hiring of Pitts itself was an act of the municipality qua municipality, allowing for liability if Ford can show sufficient causation.

actions and claims for negligent hiring, training, and supervision of Pitts.

Two statutes combine to preclude respondeat-superior liability for Pitts's actions. First, cities are liable for the acts of an employee, such as Pitts, only if the "injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness" of the employee. 1975 Ala. Code § 11-47-190. However, "[i]t is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." <u>Montgomery</u>, 99 So. 3d at 298. Section 6-5-338(a) bars a negligence claim against a police officer unless state or federal law or regulations "require otherwise" or the officer acts "beyond his or her authority or under a mistaken interpretation of the law." <u>Hollis</u>, 950 So. 2d at 307. Pitts does not fall within either of these categories; if he is liable for Ford's injuries, it is because he was improperly motivated.  One statute bars all claims except

negligence claims and the other bars nearly all negligence claims arising out of police-officer behavior. Since Ford's claim does not fit through the narrow gap left between the statutes, the court will grant summary judgment on his respondeat-superior claim.

Similarly, Ford cannot present viable claims for negligent training and supervision. Pitts was trained and supervised within the Goodwater Police Department by other police officers and the police chief. These other law-enforcement officials are state agents under § 6-5-338. Furthermore, the Alabama Supreme Court has held that training and supervision are discretionary functions and thus fall within the scope of state-agent immunity. Ex parte City of Montgomery, 99 So. 3d 282, 299 (Ala. 2012). Therefore, Ford's training and supervision claims encounter the same problem as his respondeat-superior claim. Under § 11-47-190, the city would be liable for only the negligent acts of the chief and other officers in training and supervising Pitts, but under § 6-5-338(b) the

city is immune from suit for nearly all claims of negligence by those individuals. Ford's claims are barred by these statutes.

Nonetheless, one claim remains viable: Ford's negligent-hiring claim. This court recently had cause to examine a similar claim in Hughes v. City of Montgomery, ___ F. Supp. 2d ___, 2013 WL 5945078 (M.D. Ala. Nov. 6, 2013) (Thompson, J.). In that case, the court noted that a recent opinion from the Alabama Supreme Court "seems to show that [negligent-hiring] claims may be viable against municipalities under Alabama law." Id. at *2 (citing Montgomery, 99 So. 3d at 299); cf. Floyd v. Macon Cnty Comm'n, 707 So. 2d 262 (Ala. Civ. App. 1997) (addressing a negligent hiring claim against a county in a sexual-harassment case). In both Montgomery and Hughes, the negligent-hiring claim was barred because the hiring was a discretionary activity performed by a law-enforcement officer, entitling both the officer and the city to § 6-5-338 state-agent immunity. In this case,

however, Officer Pitts was hired by the city's mayor and council, with assistance from the city clerk.  The police chief testified that he was not involved in the hiring process at all.  Since neither the mayor, the clerk, nor the council members are protected by § 6-5-338, the city may be held liable for their negligent acts, including acts of hiring, under § 11-47-190.

Furthermore, there is sufficient evidence for a state-law negligent-hiring claim to go forward.  Alabama law establishes two prerequisites to a negligent-hiring claim, in order to ensure that a plaintiff's injury was proximately caused by the alleged negligence: a plaintiff must show that the underlying conduct by the employee was wrongful, <u>Flying J Fish Farm v. Peoples Bank of Greensboro</u>, 12 So. 3d 1185, 1196 (Ala. 2008), and that the wrongful conduct was undertaken "within the line and scope of his employment," <u>Nash v. Segars</u>, 682 So. 2d 1364, 1365 (Ala. Civ. App. 1996).  As illustrated by the excessive-force analysis, Officer Pitts shot Ford in the line and

scope of his employment.  Therefore, if a jury finds Pitts liable for assault and battery, the evidence would satisfy both requirements.

The city may then be held liable for negligent hiring if the city "actually knew, or should have discovered in the exercise of due diligence, that [Officer Pitts] was likely to be abusive to" Ford and others like him. Sanders v. Shoe Show, Inc., 778 So. 2d 820, 824 (Ala. Civ. App. 2000); see also Voyager Ins. Cos. v. Whitson, 867 So. 2d 1065, 1073 (Ala. 2003).  A jury could find that the City of Goodwater should have discovered that Pitts was likely to be abusive to people in Ford's position.  The city did not contact any of Pitts's prior employers or obtain his employment files.  The city merely performed a criminal background check on Pitts and did not take any effort to contact his previous employers.  The question of whether the city acted with sufficient due diligence before putting Pitts in a position of authority with permission

29

to use lethal force is appropriately for the jury to decide.

Had the city looked into Officer Pitts's employment history, it would have found several previous incidents in which he overreacted to perceived insolence from an arrestee or criminal defendant, often using excessive force. Most notably, it appears that Pitts was terminated from the Bay Minette police department for using excessive force on an arrestee who was already secured. The Bay Minette incident occurred after Pitts had received warnings from his supervisors and had undergone anger-management treatment. While none of Pitts's previous incidents was as serious as the shooting of Ford, a jury could find that they show a pattern of violent overreaction that would predict Pitts's fateful actions in the courtroom.

The City of Goodwater argues that it would not have learned of the Bay Minette incident even if it had performed a reference check on Officer Pitts. In support,

30

the city points to a letter in Pitts's personnel file from a lawyer representing him to Bay Minette, dated before Pitts was hired by the city.  The letter states that Bay Minette had provided information about Pitts's violent history to the Atmore Police Department when Pitts had applied for a job there.  The letter goes on to argue that such intentional disclosure of Pitts's previous uses of excessive force "violates the agreement between [Pitts and Bay Minette] as well as violates employment laws." Williams Letter (Doc. No. 41-1) at 2.

This letter alone cannot establish what Bay Minette would have told Goodwater officials if they had performed any sort of basic reference check.  In the first place, the letter actually provides evidence against the city's position; it shows that Bay Minette had told another employer about Pitts's previous violent behavior, in response to a reference check, mere months before the City of Goodwater hired Pitts.  More importantly, the letter merely presents an attorney's interpretation of employment

31

law and of the purported termination agreement between
Pitts and the city.  There is no way to know from the
evidence provided whether the attorney's interpretation of
the agreement is accurate and, therefore, what Bay Minette
could lawfully have told the City of Goodwater, had any
city official performed a reference check.

Ford has presented a genuine issue of material fact
on the negligent-hiring claim, and therefore the claim
should go forward to the jury.


## C. Jurisdiction

While no party has raised the issue, the court notes
that, since all of Ford's federal claims will be
dismissed, it has discretion to decline to retain
jurisdiction over this case.  28 U.S.C. § 1367(c)
"describes the occasions on which a federal court may
exercise its <u>discretion</u> not to hear a supplemental claim
... despite the <u>power</u> of the court to hear such a claim."

32

<u>Palmer v. Hospital Auth. of Randolph Cnty.</u>, 22 F.3d 1559,

1566 (11th Cir. 1994) (emphasis in original):

> "The district courts may decline to
> exercise supplemental jurisdiction over
> a claim ... if--
>
> (1) the claim raises a novel or complex
> issue of State law,
>
> (2) the claim substantially predominates
> over the claim or claims over which the
> district     court     has     original
> jurisdiction,
>
> (3) the district court has dismissed all
> claims    over    which    it    has    original
> jurisdiction, or
>
> (4) in exceptional circumstances, there
> are    other    compelling    reasons    for
> declining jurisdiction."

28 U.S.C. § 1367(c). When one of these subsection (c)

prerequisites is present, the court's discretion should be

guided by "judicial economy, convenience, fairness to the

parties, and whether all the claims would be expected to

be tried together." <u>Palmer</u>, 22 F.3d at 1569 (citing <u>United</u>

<u>Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966)).

33

In this case, judicial economy, convenience, and fairness to the parties all weigh in favor of this court's retaining jurisdiction.  The case originated in this court and is less than a month away from trial; discovery is complete; and the questions of fact for the jury are very similar to those questions that would have been asked if the federal claims remained.  To decline jurisdiction at this point would be unnecessary formalism, lengthening the amount of time before Ford can receive relief for his injuries or Pitts and the city can clear their names.

The court will retain supplemental jurisdiction over the case.

* * *

Accordingly, it is ORDERED that defendant Jonathan Pitts's motion for summary judgment (Doc. No. 18) is denied as to the state-law assault and battery claim, but granted as to all other claims.  The state-law assault and battery claim against defendant Pitts will go to trial.

It is further ORDERED that defendant City of Goodwater's motion for summary judgment (Doc. No. 17) is denied as to the state-law negligent-hiring claim, but granted as to all other claims. The state-law negligent-hiring claim against defendant City of Goodwater will go to trial.

The court retains supplemental jurisdiction over the case.

DONE, this the 6th day of January, 2014.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE